237199 and 24368. United States v. Greenwood and Scott. We're going to wait until the everybody moves back and forth. Okay. Let's just wait for the door to close and then we can start. Okay. Mr. Weddle. Good afternoon, Your Honors, and may it please the Court. My name is Justin Weddle, and I'm appearing on behalf of Carl Sebastian Greenwood. And I started representing him in 2022, so through the plea and the sentence. Mr. Greenwood's appeal presents sentencing issues that are answered by controlling authority, which is not to say that this is a typical prosecution. It is not. The prosecutors here sought to police conduct that occurred almost entirely, about 99 percent, with no connection to U.S. victims, U.S. wives, U.S. dollars, or U.S. perpetrators. The only exception was — But you don't deny that it's legitimate to prosecute the crime for the U.S. connected conduct, do you? Not at all, Your Honor, and that's why Mr. Greenwood pled guilty to the charged crime, because for about a three-month period of time in 2015, one coin made a brief foray into the U.S. market, which it quickly abandoned. That foray, Mr. Greenwood acknowledged and accepted responsibility for. So that's the offense for which he pleaded guilty, but then the sentencing guideline says that the offense is defined not just as the offense of conviction, but also relevant conduct, which includes all of the course of conduct and the overall scheme, right? So why shouldn't that include the losses to the international victims? Well, Your Honor, if we were interpreting the relevant conduct guideline on a blank slate, that could be a perfectly valid — what Your Honor has just asked could be a perfectly valid interpretation of what relevant conduct means. In the Second Circuit, the Azeem case says that's not what the definition of relevant conduct means. The definition of relevant conduct says — Well, the Azeem case is we're concerned that there might — like, it's a separate drug offense under — I think it's Egyptian law, right? And we're not really sure how other countries treat — you know, prosecute the drug laws and so on. But this case, isn't it different? This is not a separate crime that occurred in a foreign country. It's all one scheme, right? Well, Your Honor, it is one scheme, but this — I'm going to pivot and talk about some other binding authority in the Second Circuit. The Baskinan case and other cases, including Trapillo and other cases, have said that the focus of the wire fraud statute, so the offense of conviction, is not — is not the scheme to defraud. It's the misuse of U.S. wires in furtherance of a scheme to defraud. Trapillo said that — Well, there, I was so familiar with Baskinan, I wrote it. But there, there was a question — Thank you for that opinion, Your Honor. There, there was a question of the fact that there was money that was coming in to the — and other items that were coming in to the United States, and the — and the fellow who was the beneficiary of the estate and things. There was manipulation of it. The money would move back out to where it was improperly used. And so the question is, where was — where was the injury? And to some degree, the fact that the fraudster was overseas didn't matter as long as the money had come into the United States. Now, wasn't a fair amount of the money that was even involved in some of the foreign transactions laundered here? That's a totally different question. But, yes, the answer is yes. Money that was involved in one-coin operations that had — that otherwise had nothing to do with the United States was sent to the United States. How did it get here? By wire transmission and was used in — I'm going to get to why this doesn't matter, Your Honor. It was used in financial transactions. I figured we would get there, but — But the money laundering statute doesn't apply to — it doesn't apply to any financial transaction with the proceeds of any crime that happens anywhere in the world. It only — it only applies to the proceeds of a specified unlawful activity. The specified unlawful activity here is not some violation of Chinese law against fraud involving sales of one coin into China by somebody in Bulgaria or somebody in Thailand. I get your point that the offense of conviction is the misuse of the U.S. wires, but the question is not what the offense of conviction is, right? The question is what are — what's within the scope of the jointly undertaken criminal activity and what's in furtherance of the overall scheme? What's part of a common scheme or plan and all of these standards we get from the guidelines, right? So even if you say the offense of conviction is narrowly focused on the use of the U.S. wires, why wouldn't it be the case that this same conduct using other wires and furtherance of the same common scheme is relevant conduct? Let me first talk about the offense of conviction, Your Honor. The district court applied the guidelines to a $4 billion loss amount and everything else because he said it was the — it was part of the offense of conviction. The district court did not adopt the government's argument that it was relevant conduct, and by so doing, the district court tried to sidestep or distinguish or say it was inapplicable a zine. A zine quite clearly says that relevant conduct, those words don't say anything about foreign conduct. And then you have a question presented to the judge, which is, well, when it says nothing, what does that mean? And the zine case said when it says nothing about foreign conduct, that means it doesn't count. And so that's — couldn't be clearer. And, you know, the — a zine identified policy reasons supporting that interpretation of the guidelines. The policy reason is because in that case we're talking about a separate drug crime that occurred entirely in Egypt that looked like the U.S. offense but was really only in Egypt and we don't really know exactly how Egypt would have treated it, right? Well, I disagree with the last piece of that because I think everyone knew that importing heroin into Egypt was illegal at the time. Our court's opinion does say that — They do say that that's an issue. — how other foreign countries would have treated it and so on. That could well be an issue. It's not a separate crime that we're thinking is, you know, related and would be grouped and should be brought in. It is one coherent scheme. I mean, that is what the district court said. Maybe the district court treated that as just part of the offense of conviction because the indictment talked about one overall scheme. But actually the guidelines talk about relevant conduct as other conduct that's part of a common scheme or plan. So why shouldn't we understand it that way? I stand again on Azeem, which said that the relevant conduct definition does not apply to foreign conduct because it's absent from there. Chunza Plaza, another case from this court, described Azeem as specifically saying that Azeem involved the same conspiracy. It involved the same conspiracy. So it's somewhat involved in some kind of global conspiracy and part of it touches U.S. victims. Maybe part of it touches U.S. victims who are living abroad and part of it touches foreign victims who live abroad and so on. You're saying the district court, in order to determine the amount of loss, has to list up all of the victims of the whole overall scheme and, like, parcel out only the ones with a U.S. nexus? Well, I would submit that it's wires-based. But, yes, the ones that fall within the part of one-point operations that constitute a violation of the U.S. Wire Fraud Statute plus relevant conduct, but Azeem says extraterritorial conduct is not relevant conduct, all of that would be factored into the Guidelines analysis and it would have resulted in a Guidelines recommendation around 10 years. Carl Greenwood is not getting off scot-free. I mean, you can't really allow sentences to be imposed based on conduct that's not the subject of the indictment. Even if you're acquitted of something, if the district court finds by proponents of the evidence that you did it, you can increase the sentence, right? Yes, but it has to be U.S. criminal conduct. What is the problem? You're saying it would be addressed by this rule that we have to exclude conduct that the district court thinks the defendant committed and was part of the common scheme or plan of the defendant. The reason for this, Your Honor, is, as I started, this is a very unusual case. And the government has done it my way in multiple other cases. In the Allen and Conte case, which Judge Cabranes was on that panel, and I went to the argument, and I appreciated Judge Cabranes' opening question, which was, why is this case here in the United States involving Rabobank and U.K. traders? But in Libor, the U.S. government used trades that occurred on days of manipulation, where they had days of manipulation of Libor, that involved U.S. counterparties. So the loss amount that the U.S. government used in the Libor cases was a portion of what may have been a trillion-dollar Libor-based market, a portion of that that involved the U.S. wires and U.S. victims. And so it was a $1.2 million loss amount in Allen and Conte. And in Cotabab, which is a case that we discussed in our brief, the U.S. government said, well, this guy stole a bunch of property. He brought a painting to the United States and was convicted of the transportation and receipt of that piece of stolen property. Oh, they had a whole warehouse of other stolen property from the same theft in the U.K. And the U.S. government said it was plain error to include the other stolen property, even though the jurisdictional hook, right, there's a jurisdictional hook. He brought some of it here, so it wasn't that whole theft. All of that stolen property, part of the offense conduct or part of relevant conduct, the district court in Cotabab said it was part of the same crime and, in any event, part of relevant conduct, either way. Okay. I think we've used that argument. Thank you very much. You've reserved time for rebuttal, so we'll hear from you again, but let's hear from the second appellant, Mr. Murray. My name's Conrad Scott. I'm here for Defendant Appellant Mark Scott. No relation. May it please the Court. Oh, I apologize. It says Murray, but Scott. Okay. Conrad Scott. Yes, sir. The key issue in Mr. Scott's appeal is perjury, specifically whether there's any reasonable likelihood that the repeated perjury by a key government witness could have affected the jury's verdict. Conrad Scott's appeal is perjury. Constantine Ignatoff was the only one-coin insider who testified against Mr. Scott. He was the only one who identified him as a money launderer, and he was the only one who spun this sort of web of criminality that surrounded the entire one-coin scheme and stitched what would have been otherwise kind of a fragmented, document-based case together. He also lied repeatedly on the stand. He lied about the laptop. He lied about his truthfulness in his meetings with prosecutors. And worst of all, he lied about this July 20, 2016 meeting in which he placed my client in this suspicious meeting in one-coin's office with its alleged head money launderer. That meeting never happened. Ms. Dilkensko was 3,000 miles away at the time as evidence that came out subsequently revealed. Our submission is that those lies mattered, that they were material to the verdict. The principal dispute at trial was... So it's the laptop and it's the meeting, right? I mean, does the laptop have any implication for your client? How he disposed of his laptop? The laptop, the implication of the laptop is that it does go to credibility that he was lying on the stand. Yeah, but I mean, the district court explained. I mean, you impeached his credibility extensively, right? I don't think that anywhere... Why would it have been... Why would it have pushed the jury over the edge if you got to say, oh, he also lied about how he disposed of his laptop? I think that it would have been relevant to be able to show that he lied multiple times on the stand. And just to take it back for a second, we weren't able to actually successfully show that he was lying on the stand. We wanted to. We wanted to bring in Defense Exhibit 550, which strongly suggested that his testimony at the meeting was false. And we were prevented from doing so on grounds that the government now recognizes were erroneous. So we have... That's the plan where de la Skaia or whatever it is said I'm going to be traveling, right? Exactly. Okay, well, so that's a different thing. But then, you know, even on the stand, he says, I'm not sure, I think de la Skaia was there, right? It was equivocal testimony, right? I would disagree with that assessment of the record, Your Honor. I think he says that he's pretty sure and then says that he's almost 100% sure and then ultimately agrees that he is 100% sure. So to the extent that the district court found that his testimony on that point was equivocal, we would disagree with that particular assessment. And why do you think that that is important for your client? Because you think the absence of de la Skaia... Sorry. The absence of that person shows the meeting didn't happen or it's important that that person wasn't at the meeting? I think the perjury is relevant for two different reasons. I mean, the first reason is as impeachment evidence to show that this government witness, who the government brought in and propped up and said, this is his cooperation agreement, it basically guarantees that he's going to tell the truth, to show that he actually was lying repeatedly on the stand. Now, I think that the meeting testimony isn't just impeachment evidence. I think that is inculpatory. And the reason why is that there's no direct evidence in this case that Mr. Scott knew that the money that he was transacting in represented the proceeds of a crime. And that was the key dispute at trial. So what the government wanted was to get the jury to draw a series of inferences... But he doesn't deny that he's providing legal advice to the company, right? He was... Well, I believe that he understood himself to be working for Ruja, transacting from her money. Right. So the idea that there's testimony that he attended a meeting with her and the witness doesn't know exactly what was said at the meeting or what happened, like, how does that go to... How does that undermine even this defense that he was providing advice but thought it was a legitimate business? Well, three points. Constantine testifies that the meeting happened under really unusual circumstances, that he was asked to clear the entire floor so that no one would be present in the office except for Ruja, the head of the scheme, Dilkinska, who he describes as the head money launderer of all of OneCoin, and Mr. Scott. So the meeting itself is being described in those terms. And to the extent that the district court found that Constantine didn't have knowledge about the contents of the meeting, again, we would disagree with that assessment of the record. He testifies that Dilkinska calls him afterwards and says that she had to stay a long time to explain to Mark Scott everything that had to be done. And I think that's relevant for an important reason. Why does that show the contents of the meeting? Well, the contents of the meeting were... I used to be a lawyer. I provided legal advice. Sometimes people had to explain what needed to be done. So even if you're providing real legal advice, that might be a legitimate testimony, right? It might have been, but I think the question isn't whether it might have been legitimate but whether it could have influenced the jury's decision here. I think that's also relevant in part because if he were just managing... if he were just managing funds on her behalf, setting up offshore investment funds that she was moving money into, it's not clear why Dilkinska would have had to have told him about everything that has to be done. Our submission is there's just not that much in the record here to suggest that Mr. Scott knew that what he... the money that he was moving represented the proceeds of crime. And given how little there is in the record on that point, that really any evidence that Constantine was providing here really helped stitch the government's case together. And create the implication that these were criminals and that if you were doing business with them, you kind of should have known that they were criminals as well. Well, he had some misrepresentations with regard to Apex, didn't he? And he was aware of the fact that there was a criminal investigation going on in London. So it's not like he was just not aware of anything that was going on with regard to some people calling into question the legitimacy of this operation. Is that the case? We would agree there is some evidence of concealment with respect to Apex, the non-bank fund administrator here. Right. That goes to the concealment. Well, there's a reason. Well, that goes... To launder the money. Well, our defense... The defense that was presented to the jury was that he was... He was taking $50 million for less than a year's work. Again, I think that the record's actually... If you want to practice law again. The record's somewhat equivocal on that point. I think that some of that came in the form of a termination fee. I just also want to point out, this isn't a sufficiency argument. The question isn't whether there's some evidence against Apex. Well, I mean, you're hanging your head on the credibility of one witness. And my suggestion to you is that there was some additional evidence beyond just this one fellow pointing a finger at your client. And we don't disagree that there was... Okay. We don't disagree that there was also some evidence. I would just direct the Court back to the legal standard here under Wallach, that if the government should have known about the false testimony, the question isn't whether there's some evidence. The question is whether there's so little evidence that the jury couldn't have reasonably acquitted. We understand. We know the standard. Okay. Thank you very much, Mr. Scott. You've also reserved time for rebuttal, but let's hear from the government. Ms. Murray. May it please the Court. My name is Julianna Murray. I'm an assistant United States attorney in the Southern District of New York, and I represent the United States in this appeal. I will be addressing the arguments of Appellant Mark Scott relating to his trial, and my colleague will be addressing Appellant Greenwood's arguments. The district court did not abuse its discretion in denying Scott's motion for a new trial based on Konstantin Ignatov's testimony regarding either the laptop or whether Irina Dilkinska attended the July 20, 2016 meeting. At trial, there was no dispute that OneCoin was a fraud scheme or that the $400 million that Scott transferred through the Finero funds was derived from criminal activity. The government's proof included bank records and charts that detailed Scott's network of offshore bank accounts and his transferring of OneCoin's scheme proceeds. The key question at trial was whether Scott knew that the money that he received by the Finero funds was criminally derived, and separate and apart from any testimony by Konstantin Ignatov, the government's evidence at trial established that fact. The evidence at trial included evidence that the Finero funds were not legitimate investments but rather fronts created to clean Ruja Ignatov's proceeds by disguising the money as investments. Scott. Indeed, at some point in time, somebody questioned him about the legitimacy of the use of the Finero funds, didn't they? Yes, Your Honor, and he repeatedly lied to Apex. We had a transcript that was introduced at trial of those conversations. Some of the comments that he made in email said that he was, quote, sidestepping due diligence regarding the source of funds. In the same email chain, he advised that R, or Ruja, needed to approve deploying the funds, which indicates his knowledge that they are her funds. He then wrote, in the same email chain, to a co-conspirator, the possible link to O.C. or OneCoin will kill this for us. Scott was also an attorney who made approximately $50 million. But that's not to say he's involved in all of these general operations and maybe should have known. So why isn't the testimony that he went to a particular very shady meeting where they cleared out the whole floor and had to stay late to explain everything that had to happen, why isn't that especially central to the question about whether he knew about its operations? First, Your Honor, there's no dispute that Scott attended the meeting, that the meeting was with Ruja Ignatova, who was the head of the scheme. The issue that was the subject of Constantine's testimony that Scott now argues against was whether Dylkinska attended. It's simply not a material fact whether Dylkinska was at that meeting or not. Judge Ramos did not abuse his discretion because neither the laptop nor the meeting were material, and that's a threshold question. Even if there were perjury, which the government contends there was not with respect to the meeting, it would need to be a materially falsely... Her presence would have had to have been necessary for some kind of something to have happened. It would have to be material to issues presented at trial. And as I mentioned, the issue at trial was whether Scott... Well, I don't know. If he's committing perjury about the attendees at the meeting, doesn't it cast doubt on the testimony about whether that meeting happened or whether it actually proceeded with all the cloak-and-dagger atmospherics that he describes? And wouldn't that be very important to point out to the jury? The first question is whether it was perjury, and it was not perjury. Judge Ramos evaluated the testimony in the scope of the entire trial, which he presided over, and there's substantial deference afforded to a trial judge who observes witnesses in the course of trial. As Your Honor pointed out correctly, the government categorically disagrees with the, you know, the fact that he conceded that she was 100 percent at the meeting. On cross-examination, initially, when he was pressed whether Jalkinska was present, he said, quote, I'm pretty sure. He was asked again. He said, quote, I'm pretty sure, yes. He was asked yet again, and he said, I'm pretty sure. Even the next day, when cross-examination continued and defense showed Constantine defense exhibit 550, which was the e-mail indicating Jalkinska's future intent to travel, Scott's response when he was asked whether she was at the meeting was, quote, I'm pretty sure she was. That is equivocal testimony, and Judge Ramos correctly held that Scott had not met his burden of establishing by a preponderance of the evidence that Constantine willfully testified falsely about the meeting. So the testimony was not perjury, and it cannot form the basis to grant Scott's motion for a new trial. I would just note, even if the Court were to find that it were perjury, it was cumulative impeachment evidence of Constantine. He was impeached extensively with respect to his credibility. He was subjected to extensive cross-examination on this very particular topic, and defense was able to make these arguments, including in closing. I'm happy to address any of the other issues. Do you think it's right that he said that he doesn't know what happened at the meeting? I don't have a view with respect to whether that was willfully false testimony. I will say at the time of trial, there was no evidence that definitively refuted Jalkinska's presence at the meeting. We had the two attempted defense exhibits, one indicating that she intended to travel, another where she indicated that she was traveling. But there's no way to know whether those were accurate or whether Mark Scott's calendar entry indicating that he was meeting with Ruzsa and Jalkinska was accurate. Simply put, there were plenty of reasons for the government to believe that Constantine had accurately recalled that she was present at that meeting. But, again, regardless of whether she was present or not, it fails under any standard because it was simply not material. I'm happy to address any other questions. Otherwise, we'll rest on our submissions. Okay. Thank you very much, Ms. Murray. Mr. Mead. Good afternoon. May it please the Court. Excuse me, I got calls. May it please the Court. Kevin Mead, appearing for the government and handling the issues related to the Greenwood sentencing. I handled the Greenwood issues related to the Greenwood sentencing below. Sebastian Greenwood helped lead a single massive international Can you fix the microphone? Oh, I apologize, Your Honor. Just yell at us, please. I can be loud, Your Honor. Do that. Sebastian Greenwood helped lead a single massive international fraud scheme called OneCoin. It sold one fake product. It had one headquarters in Bulgaria. Okay, we're not even arguing that the international conduct is part of the offense of conviction, are we? We are, Your Honor. So you are saying that. We are arguing that, Your Honor, yes. So if the offense is the use of the U.S. wires, then how could that be? So the offense is the entire scheme, which involves U.S. wires, of course. But it was a broad scheme. Wire fraud is a scheme-based offense. And there were U.S. domestic wires in furtherance of that scheme. And there were also international wires. And that's, of course, common. Here, as a matter of fact, it was one factual scheme. It was charged as one single scheme. The charging language in the indictment describes it as one single international fraud. And even the defendant's own allocution. Yeah, but you're charging the facts. I mean, the facts are there was one big fraud. But, like, the violation was the misuse of the U.S. wires, right? That's correct, Your Honor. The specific, I mean, the wires are, of course, the U.S. wires. But I think the offense of conviction is broader than that. The offense of conviction is based on the facts and on the way we charged it. But even if the offense of conviction is only the U.S. wires, under the sentencing guidelines, of course, the court is supposed to consider whether there was other relevant conduct. I get that, and I was saying that. But on the first argument, so, you know, you don't deny that if there's a massive fraud scheme and it all happens without the use of the U.S. wires, you could not charge it at all. That's correct, Your Honor. But if there's one victim who is victimized through the use of the U.S. wires, you're saying the entire international scheme becomes the offense of conviction. As long as it is charged that way, Your Honor. I mean, it could be charged in a more narrow fashion, and that's what happened in one of the cases the defense cited. So the offense of conviction is determined by the charging documents, not by the elements of the statute that's being violated? I think, of course, it has to meet the elements, and I don't think there's any dispute that here we met the elements. I think the offense of conviction is defined both by the facts, was there in fact one scheme, and also by the charging language. And so, you know, you could charge a case narrowly. You could charge a single. The government could charge, you know, 1,000 separate fraud counts, one against each victim, you know, in the United States in this case. In that case, there's no big overall scheme that's charged. The offense of conviction is each of those 1,000 frauds, and then the defendant is still held responsible for the broader scheme as relevant conduct, not as offense of conviction. But that's not what happened here. Here we charged the case as one big scheme because it was one big scheme. So that means that the scope of the offense can vary pretty widely depending on just what the government writes in the charging documents. Is that your position? It is, Your Honor. And obviously that doesn't mean the government has this broad, unlimited authority to do whatever it wants, right? Well, I mean, it's incredibly tactile. Your theory here, your theory was that this was an operation that had global kind of implications and had on a number of occasions customers, in quotes, who were in the United States. And wires were used with regard to the solicitation of those individuals. Wires were used by those individuals to send the defendants money. And that money then traveled by wire or otherwise in money laundering operations that were particularized to the United States. The fact that it was uniform was because my clerks and I have been going around on hypotheticals, and this fellow sits at a desk and he's got a script on, oh, he's going to make a pitch to somebody to get money from him. He calls a number in Rochester, New York. It's a pitch, $50,000 just hedges his way and he directs it to a bank in New York City. He calls Toronto, Canada, calls outside the United States. Money, $50,000, Canadian, comes across to Canadians, originates in a Canadian wire and ends up in a U.S. bank. And so one is international, not within the wire fraud, and the other isn't. But they're the exact same pitch, the exact same operation, and that's kind of your theory here, isn't that what you're talking about? I think that's basically correct, Your Honor. We appreciate the criminality one has to understand the sheer size of it. That's exactly right. It's a scheme of facts. This is a sentencing issue. This is not a criminal liability issue. They were convicted of U.S. conduct. That's exactly right. Pleaded to U.S. conduct. No dispute that there is a sufficient basis for jurisdiction on U.S. conduct. This is all about whether this defendant, who committed a $4 billion fraud, should be held responsible for the fraction that is U.S. or should be held responsible at sentencing for the full scope of his fraud. In the post-Booker world, is this, I mean, so one is the scope of the offense then ends up doing the guidelines calculation, right? The guidelines of advisory. Some of the law that was generated at the time when they were mandatory, one has to weigh it in that context. But now, so could Judge Ramos have equally said this is relevant conduct and I think this guy deserves to do five years in jail? I'm not sure I fully understand the question. So he could have, if he found the loss amount was much smaller, we think that would have been incorrect to terminate. All right. But the loss amount is calved by the scope of the crime, right? By the scope of the offense and by relevant conduct. And the relevant conduct. Yes, Your Honor. Okay. So Judge Ramos could have found this was not part of the offense of conviction but was part of a common scheme or plan and therefore taken it all into account that way as well. Well, that's my point. I mean, it's kind of squishy here. It doesn't fit in. It's harder now to fit in the context when the guidelines are other than the relevant. I mean, other than the fact that it sets the upper end of the guidelines, right? Well, the guidelines are advisory, but we've said that they have an important anchoring effect, right? And so if we have this presumption that the crime doesn't apply extraterritorially, why shouldn't we understand the guidelines to anchor you in the actual offense before taking into account losses that happen everywhere else? I mean, he starts from the premise that the offense itself involves all of its international victims about whom you could not bring specific charges. I mean, in general, the guidelines sweep broadly. And 18 U.S.C. 3661 says no limitation should be placed on the information concerning the background, character, and conduct of a person convicted of an event. There's kind of a baseline assumption in the guidelines that we sweep broadly, right? The guidelines generally look at that. So what about this Azeem case? So if we have said that we are worried about foreign conduct, that the foreign country may or may not prosecute as a crime and so on, why isn't there a principle that you don't take into account the foreign conduct that's under a foreign jurisdiction when you're determining the scope of the losses because of a U.S.-based crime? So Azeem is a very different case than this one and for a couple of reasons. One is the Azeem analysis was based on a similar course of conduct. Azeem says this is not the same crime, right? Moving heroin from Pakistan to Egypt is not the same crime. That would equally be relevant conduct under the guidelines, right? I mean, if it's a closely related crime that would be grouped and it's part of a common scheme or plan that involves the same modus operandi, so certainly the drug deal would be included. It is. So why would we create an exception for a related crime but not an exception for part of the scheme that involves purely extraterritorial conduct? I think there's a good reason to treat related crimes differently from the big same crime, right? He's convicted of this fraud scheme. He should be held responsible for the full scope of the fraud. If he's doing totally different fraud somewhere else, it makes a lot of sense to not necessarily hold him responsible for that. That's factually not what is happening here, right? We have one big fraud. I don't know if that begs the question, right? I mean, he's convicted of misuse of the U.S. wires, and so you, I guess, are arguing that his misuse of the foreign wires is part of the same crime, but that's not completely obvious. So, like, let's say we thought that actually his misuse of the U.S. wires is the offense of conviction and misuse of foreign wires is at most relevant conduct, and you just said, well, if it's a separate fraud that occurs abroad, maybe it shouldn't be included in the loss. So does that mean that if we think of them as separate conduct, we should say the district court should have started with the U.S. losses? I think separate conduct is a tricky term. Obviously, if it is totally separate, I think that's fair. Here, though, wire fraud, again, it's a scheme offense. It has scheme in the statutory language, and we're all talking about one big scheme, and it's not uncommon for a scheme like this to target people in multiple jurisdictions. One of the other reasons to potentially distinguish Azeem, Azeem is very focused on this potential for conduct not being illegal in the other country, right? And so they're worried, okay, we're talking about drugs. Are the drugs really illegal in Egypt? Are we really going to look into this issue? That's not a motivating concern here, right? This was a blatant, overt fraud. It's the kind of blatant, overt fraud that is criminal everywhere, and it's all linked together. It's criminal everywhere. I mean, it's a fraudulent marketing scheme. I don't know if it's completely obvious. It's more obvious to me that drugs are illegal in Egypt and that every country is going to treat this kind of fraudulent marketing scheme the same. I think sometimes there are fine gradations in wire fraud, and one could imagine that, oh, some country might treat it differently. This was taking people's money. I don't know of a country that says you could take somebody's money and not have to give it back when you take it under a fault. It's exactly right, Your Honor. This is fraud under any definition of the term. Okay, thank you. So if, in fact, instead of having just one unitary scheme, if the facts showed that they had a portfolio of U.S. victims that did something with respect to them and then had a portfolio of the foreign victims and did something closely related but slightly different, you're saying the guidelines might be completely different because then you might state they're different schemes. It would depend on the facts to some extent, and I think we would still rely on our, well, drugs are different argument, but I think for the relevant conduct argument that it would make a difference if there were different schemes happening in different countries. But there's no dispute that this is all one big fraud. It's the same product. It's the same leadership. It's the same marketing.  Exactly, Your Honor. Yes. Okay. Thank you very much, Mr. Abid. We'll hear back from Mr. Weddle on refutal. Thank you, Your Honors. The government's argument leaves no work to be done by relevant conduct. The government's argument is wire fraud is a scheme-based offense. It's all part of the same scheme. If we have one non-incidental, if we have one essential wire, we get to lasso the entire thing into the United States and use it at sentencing. That's inconsistent with Basquinan. It's inconsistent with Trepillo. It's inconsistent with lots of case law about what the scope of the wire fraud punishes. The purpose of the wire fraud statute is to prevent the misuse of U.S. telecommunications systems in furtherance of a fraud scheme. It is not to empower the federal government in the United States and New York to go out and police the world as long as they can find one essential wire. When we think about that question about what the offense of conviction is, does that depend on the way the government charges the crime or does it depend on something else? Absolutely cannot depend on how the government charges the crime. Congress makes the offense of conviction.  It depends on the words of the statute and this Court's interpretation of the scope of the statute. Your Honor, a U.S. crime is the criminal conduct that is illegal under a statute passed by Congress and signed by the President. That's why this Court's decision in Greer is different because in that case, Congress had made the decision that if you distribute drugs or, you know, possess with intent to distribute drugs in the territorial waters of another country, it's a U.S. crime. As long as the other country, in that case Canada, consents to the prosecution here. So Congress can make a decision to make wire fraud extraterritorial. But they can't. I think we have that argument. Can I say one other thing? One last point. Okay. The part of the scheme that constitutes the U.S. criminal conduct is the part that should be sentenced. This case is no different from LIBOR. It's no different from ELBAS that we cited. It's no different from Azeem. Azeem had the same three participants. One of them was a government agent. So two conspirators and one other person, all the same, same conspiracy, one jurisdictional hook, which is importation into the United States. I think we have that. Thank you very much. One simple question. Your client pleaded guilty to an information, right? Yes, Your Honor. And that information described participation in what was described as a, quote, $1 billion international scheme, right? You may have said more than $1 billion, but, yes, it did, and my client did not admit that. He pleaded guilty to the charges in the information. He allocated. His allocution are his admissions, and those satisfy the elements of U.S. wire fraud. You don't think there was any kind of admission to have participated in a $1 billion international scheme? He participated in the operations of OneCoin. OneCoin had gross revenue more than $1 billion. 2.3 million euros of that went to China. The amount of money involved in the United States is somewhere around, at most, $10 million. It's eminently knowable. The documents in our appendix. And I should say, Your Honor, I wanted to cite the ‑‑ I referenced the libel case a couple of times. I wanted to cite it in our appellate brief. It didn't make it in the cutting process, but we did cite it in our briefs below, if Your Honors are interested in.  We will take a look. Thank you very much, Mr. Weddle. Let's hear from Mr. Scott Onward-Weddle. Thank you, Your Honor. We also raise an extraterritoriality argument in our brief. I agree with much of what Mr. Weddle just said as regards sentencing. That applies to Mr. Scott as well. We have the further argument that the government actually didn't prove the money laundering conspiracy. Based on the proof actually presented at Mr. Scott's trial, that they didn't prove that there was an underlying wire fraud that had a sufficient U.S. nexus. As to perjury, the government, as I understand, disputes whether Constantine perjured himself. We asked for a hearing below about his intent. I think if there's a question about whether Constantine testified falsely with Mins Rea, that's something that should have been resolved through a hearing. As to materiality, the question is not whether the testimony about the meeting was material in isolation. Materiality in this context considers the entire body of the testimony given by the perjured witness. And that's because evidence that that witness was lying would allow the government, or sorry, would allow the jury to discredit that witness's testimony entirely. So, for example, in Wallach, there's perjury about whether the witness stopped gambling at a certain time. The question is not whether that testimony in isolation was material. It's about the full effect of all of his testimony at the trial. With regards to any evidence of concealment, I think the record's more equivocal than the government has made out. Spindiff, who is the APEC's managing director, ended up admitting on cross that Scott didn't conceal Ruge's name from him. There's other evidence that we could point to on that. So, for example, Mr. Scott reported all this income and filed tax returns. If he was running an international money laundering scheme to launder the proceeds of what he knew was crime, it was a very odd move to have done it through a management entity that he named after himself and reported the FBARs on all the accounts and all the tax returns. And then the final point I wanted to make was that the evidence isn't as – this isn't a case in which there's overwhelming or devastating independent evidence against Mr. Scott as the government makes out. If you look at the cases cited by the government, in Stewart and White, the perjured witness's testimony was so unimportant, you could tell that because the defendants were actually acquitted on the charges on which that witness's testimony – that depended on that witness's testimony. In Parks and Wong, they both had the defendant dead to rights. So, for example, in Wong, they had him with a bag full of heroin. So the fact that a witness may have given some minor, minor perjury doesn't displace that key fact. There's nothing like that in this case. Thank you, Your Honor. Mr. Scott, the case is submitted.